FILED
01/14/2020
Clerk of the
Appellate Courts

IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs June 19, 2019

**STATE OF TENNESSEE v. STEVEN DALE DAVIDSON, JR.**

**Appeal from the Criminal Court for White County**
**No. 2016-CR-7976     David A. Patterson, Judge**

_____

**No. M2018-00182-CCA-R3-CD**

_____

The Defendant, Steven Dale Davidson, Jr., was convicted by a jury of voluntary manslaughter and vehicular homicide.  Thereafter, the trial court merged the counts and imposed an effective ten-year sentence, to run consecutively to a previous sentence for which probation had been revoked due to the convictions in this case.  On appeal, the Defendant contends that the trial court erred by excluding the complete police interview of a defense witness and in its consideration during sentencing of enhancement and mitigating factors.  Upon review of the record and the applicable law, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS, P.J., and ROBERT L. HOLLOWAY, JR., J., joined.

Michael J. Rocco (on appeal), and David Barnes (at trial), Sparta, Tennessee, for the appellant, Steven Dale Davidson, Jr.

Herbert H. Slatery III, Attorney General and Reporter; Katherine C. Redding, Assistant Attorney General; Bryant C. Dunaway, District Attorney General; and Bruce MacLeod and Philip Hatch, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**
FACTUAL BACKGROUND[1]

        This case arises from the April 15, 2016 death of the victim, Nick Culver.  From the proof adduced at trial, the events were as follows:

_____

[1] The Defendant does not raise sufficiency of the evidence on appeal.  We will, therefore, confine our summation of the facts to those necessary to give context to the issues on appeal.

At the time, the Defendant was in a romantic relationship with Christy Flewellen,[2] who was separated from her then-husband Joshua Flewellen. Early on the morning of April 15 around 4:00 a.m., the Defendant went with Mrs. Flewellen and Jayce Passons to Mr. Flewellen's house in order to retrieve Mrs. Flewellen's green GMC truck. Mr. Passons wore a black ski mask. The testimony indicated that Mr. and Mrs. Flewellen had a volatile relationship, with multiple individuals stating that they were concerned for the safety of both Mrs. Flewellen and Mr. Flewellen.

When they arrived at Mr. Flewellen's house, Lacey Davidson, who was the Defendant's sister, Mr. Flewellen, and the victim were present at the house. Mrs. Flewellen started the truck, and Mr. Flewellen, alerted to her actions, jumped off of the house's roof and climbed into the passenger seat through the truck's window. Mrs. Flewellen drove to the parking lot of Bear Cove Baptist Church. The Defendant, Mr. Passons, Ms. Davidson, and the victim followed in their respective vehicles. The Defendant drove a yellow Dodge Dakota pickup truck, and the victim drove a white Toyota sedan.

At the church, Mr. Flewellen and Mrs. Flewellen argued, and the confrontation became physical. Mrs. Flewellen testified that Mr. Flewellen "pull[ed] his knives and stuff out," but she was the only one to testify as to the presence of a knife during the confrontation. At this point, the Defendant intervened, and the two men fought until the Defendant pinned Mr. Flewellen to the ground and held him by his throat. The victim separated the Defendant and Mr. Flewellen by pushing the Defendant with his foot, and all the witnesses at trial agreed that the Defendant did not fight with the victim. Although Mrs. Flewellen did not see the Defendant get hit, she stated that the Defendant was injured on "his mouth and stuff, [he was] was bleeding on top of his head and stuff." There was some testimony indicating that Ms. Davidson, who admitted she had smoked marijuana and consumed a small amount of alcohol, wielded a "maul" and hit the hood of the Defendant's truck, although she denied having done so. There was a documented hole in the Dodge's hood of the approximate diameter of the maul, and the maul was found on the road near the crime scene.

The group began to leave the parking lot. Mrs. Flewellen drove the GMC, the victim drove the Toyota, and it was an issue at trial whether the Defendant or Mr. Passons drove the Dodge. Mr. Flewellen again got into the passenger seat of the GMC, and Ms. Davidson jumped into the GMC's truck bed. Mrs. Flewellen drove away from the church and after a short distance, the victim's car sped ahead of the truck, pulled in front of it, and stopped. The GMC braked, "tossing" Ms. Davidson about in the truck bed, and Mrs. Flewellen drove around the victim's car.

---

[2] Christy Flewellen and the Defendant were married after his trial. Because Mrs. Davidson's surname was Flewellen at the time of trial, we will refer to her as Mrs. Flewellen. We intend no disrespect.

From the accident reconstruction testimony, Ms. Davidson's testimony, and the physical evidence, it appeared that at this point, the victim exited his car and was standing inside the hinge of the open driver's side door when the Dodge accelerated and swerved toward him. The Toyota was struck by the Dodge and pushed some distance before the vehicles separated, and the Dodge went onto the grass on the opposite shoulder. The driver of the Dodge course corrected and swerved to the right to come back onto the road, and the Dodge hit the Toyota a second time before driving away. The victim was struck by the Dodge during one or both collisions. No brake marks from a truck were evident near the location of either impact.

Ms. Davidson saw the crash occur as she looked backward from the GMC truck bed. She yelled at Mrs. Flewellen to stop and jumped out of the truck bed before running to the victim, who was "suffocating on his own blood." She turned the victim to clear his airway and eventually began CPR. The Dodge drove away from the scene without stopping, passing Ms. Davidson as she ran down the road. Ms. Davidson saw that the Defendant was driving. Mrs. Flewellen also saw the Dodge drive past her after she stopped the truck, but the windows were too dark for her to see who was driving.

The autopsy reflected that the victim's extensive blunt force injuries were consistent with having been struck and dragged by a motor vehicle for some distance. The victim suffered from fatal contusions at the base of his skull and spinal injuries that would have left him paralyzed. The medical examiner concluded that the cause of death was multiple blunt force injuries and that the manner of death was homicide.

Mrs. Flewellen testified that when she made her way back to Mr. Passons's house, she found the Defendant lying on a couch inside the house; he was bleeding and unresponsive; and eventually he began to speak but it "was quiet and . . . a jumble." The Defendant had a seizure about one hour later. The passenger compartment of the Defendant's truck was spray-painted black after the accident and placed in some woods down a hill behind Mr. Passons's house. Mr. Passons evidently participated in the painting as well as the Defendant. The Defendant stated in his police interview that he painted the driver's side door. The arresting officers documented black paint on the Defendant's hands.

The audio recording of the Defendant's police interview included in the record is of poor sound quality. However, our review of the recording reflects that the Defendant initially denied having driven the Dodge truck, but about halfway through the interview admitted having driven the truck during the crash. He stated that after hitting the victim's car, he stopped, and Mr. Passons drove the rest of the way to Mr. Passons's house.

Multiple witnesses testified regarding their personal knowledge that the Defendant had suffered a brain injury in an accident one year prior to the victim's death and that as a

result of the injury, he suffered from seizures and was not permitted to drive. The Defendant also discussed his injury during his police interview. Ms. Davidson specifically testified that the Defendant's seizure medications made him tired and forgetful. Trista Atnip, the Defendant's cousin's fiancée, testified that she had witnessed the Defendant's seizures and the after effects, which could last two to three days. The Defendant would suffer from severe headaches and dizziness, want to be in a dark room, and be "very forgetful." Ms. Atnip added that the Defendant had generally forgotten things since the accident.

Casey Fraze testified for the defense that he worked with Mrs. Flewellen and that on April 15, 2016, he was at his then-girlfriend's house between 3:00 and 4:00 a.m. when he heard a "commotion" and went outside to smoke a cigarette. He walked down the street and up a hill, and he saw a yellow truck in the parking lot of Bear Cove Baptist Church that he was able to identify as a Dodge Dakota. He saw two men, a taller blonde man and a "dark-haired guy" who was six to ten inches shorter than the blonde man.[3] He could not identify either man. He estimated that he was between one hundred fifty and two hundred yards away from the men. The blonde man entered the driver's side of the truck and the darker-haired man entered the passenger's side, and they drove away from the church. Mr. Fraze agreed that he did not hear a crash or screaming and that he did not see any other cars. Mr. Fraze agreed that he, the Defendant, and Mrs. Flewellen were "going to eat and have steaks" if the Defendant were found not guilty. The defense introduced a booking photograph of Jayce Passons for identification purposes, which reflected he had blonde hair and was six foot two inches tall.

Mrs. Flewellen testified for the defense, stating that she did not know if the Defendant was driving the Dodge and that she told the police as much. The State impeached Mrs. Flewellen with a video-recorded portion of her police interview, which reflected that the Defendant was driving when they all left the church parking lot. A portion of Mrs. Flewellen's recorded police interview, which was not introduced as an exhibit or included in the record on appeal, was played for the jury.

Mrs. Flewellen testified that in the interview, she had also said she was not one hundred percent certain the Defendant was driving and that she assumed the Defendant had been driving because he owned the truck. Mrs. Flewellen maintained that she was not sure whether the Defendant was driving and that she did not see who entered the driver's side of the truck. Mrs. Flewellen acknowledged her previous statement in her police interview that the Defendant stopped after hitting the victim and changed seats with Mr. Passons, who drove them away from the scene.

---

[3] The record reflects that the Defendant had dark hair.

-4-

On redirect examination, defense counsel sought to introduce the entirety of Mrs. Flewellen's police interview under Tennessee Rule of Evidence 106, known as the rule of completeness, to demonstrate that she had repeatedly stated that the Defendant was not driving when the victim was hit before eventually changing her statement toward the end of the interview. The trial court found that the interview was inadmissible hearsay. However, the court allowed counsel to question Mrs. Flewellen further about the interview, and she maintained that she did not see who was driving when the Dodge left the church parking lot.

Upon this evidence, the Defendant was convicted of voluntary manslaughter and vehicular homicide. At the sentencing hearing, Tennessee Department of Correction Officer Ralph Brian Lewis testified that he composed the Defendant's presentence report and that the Defendant had three previous convictions: theft of property (shoplifting) in 2013; aggravated burglary in 2014; and felony theft of property in 2014. The judgments in DeKalb County Criminal Court case numbers 2014-CR-94[4] and 2014-CR-95 reflected that on June 24, 2014, the Defendant pled guilty to theft of property over $1,000, a Class D felony, and aggravated burglary, a Class C felony, respectively.[5] In each case, the Defendant received a four-year sentence suspended to four years of supervised probation, to run concurrently with the other case. The Defendant's probation had been revoked on June 20, 2017, as a result of the offenses in the present case. Officer Lewis noted that April 15, 2016, was during the Defendant's probationary period.

Pastor Emory Thompson testified for the defense that he had known the Defendant since the Defendant was age ten and that he had previously worked with the Defendant in construction and on a farm. The Defendant attended Mr. Thompson's church, and Mr. Thompson stated that he had offered the Defendant a job with Mr. Thompson's construction company if the Defendant were released from prison.

Larry Culver, the victim's father, testified and made a victim impact statement. He stated that as a result of the victim's death, the victim's mother had been "stressed . . . awful" before she also passed away, that Mr. Culver's granddaughter had to go to a psychiatrist, and that Mr. Culver had "a lot of nightmares[.]" Mr. Culver noted that the victim's death was "something that never should have happened[.]"

The trial court found that the Defendant was a Range II, multiple offender and that the sentencing range was six to ten years at thirty-five percent service. Relative to enhancement factors, the court found that the Defendant had a previous history of criminal convictions in addition to those necessary to establish the appropriate range. See Tenn. Code Ann. § 40-35-114(1). The court found that the Defendant had two prior

---

[4] The date of offense for case number 2014-CR-95 was November 5, 2013.
[5] The date of offense for case number 2014-CR-94 was November 13, 2013.

-5-

felony convictions, one Class C felony and one Class D felony, that were committed on separate dates. The court took into consideration the Defendant's prior misdemeanor shoplifting conviction in its assessment of the Defendant's prior criminal behavior.

The trial court found relative to the voluntary manslaughter conviction only that the Defendant possessed or employed a deadly weapon, a motor vehicle, during the commission of the offense. See Tenn. Code Ann. § 40-35-114(9). The court further found that the Defendant had been released on probation at the time the felony was committed. See Tenn. Code Ann. § 40-35-114(13)(C). The court noted that the Defendant's probation had been revoked as a result of this case, that the Defendant had been on probation for one year and eight or nine months when he committed the instant offenses, and that the court took this fact into consideration as it weighed the issue of consecutive sentencing.

The trial court considered the Defendant's argument that he acted under strong provocation and found that this mitigating factor did not apply. See Tenn. Code Ann. § 40-35-113(2). The court stated,

> Voluntary manslaughter is what he was convicted of. Vehicular homicide is what he was convicted of. He was charged with second degree murder. He was blessed by the fact that the jury did not come back with second degree murder. The [S]tate argued it well, it was well presented, and had they come back with second degree murder the court would have accepted it. Knowing killing of another person could be shown in this case also. I do not believe that strong provocation is appropriate in this case and do not consider it to be a mitigating factor.

The court also stated that mitigating factor (3), substantial grounds existed tending to excuse or justify the Defendant's conduct while failing to establish a defense, did not apply. See Tenn. Code Ann. § 40-35-113(3). Relative to mitigating factor (8), the Defendant was suffering from a mental or physical condition that significantly reduced his culpability, the court noted that the Defendant had argued this factor was applicable given his previous head injury. See Tenn. Code Ann. § 40-35-113(8). The court found, though, that this factor did not apply because the court "did not hear any substantial proof . . . that that was the case, no medical proof . . . . We heard that he had been in an accident at another time, he had . . . certain injury[.]"

Relative to mitigating factor (11), that the Defendant committed the offense under such unusual circumstances that it was unlikely that a sustained intent to violate the law motivated the criminal conduct, the trial court found that it was "totally not being considered by the court." See Tenn. Code Ann. § 40-35-113(11). The court found that the Defendant "was motivated, that he did commit this offense, that he did it not

intentionally in terms of a first degree murder, but he certainly did fall into . . . what the elements of the offenses require." Relative to mitigating factor (13), any other factor consistent with the purposes of sentencing, the court found that the Defendant "was in some way moved" by the victim's death and that the Defendant "very likely was remorseful." See Tenn. Code Ann. § 40-35-113(13). The court noted, though, that the Defendant could have been upset from "considering his own plight[.]" The court applied mitigating factor (13) but did "not give it much weight."

The trial court gave "great weight" to "the enhancing factors" and ordered a sentence of ten years for voluntary manslaughter and eight years for vehicular homicide, to run concurrently. The court merged the offenses and ordered that the effective ten-year sentence run consecutively to the four-year DeKalb County sentence. The court found that although the Defendant was not a professional criminal, the Defendant had a "somewhat" extensive history of criminal activity. The court noted the Defendant's three prior convictions and, including the present offenses, four felony convictions. The court found that the Defendant had committed the offenses in this case while on probation. The trial court found that the Defendant lacked the potential for rehabilitation and noted the Defendant's "moderate" "Strong R Assessment" and the court's belief the Defendant would reoffend.

The trial court denied the Defendant's motion for new trial by written order filed on February 13, 2018. The Defendant timely appealed.

## ANALYSIS

### I.     *Mrs. Flewellen's Interview Recording*

The Defendant contends that the trial court erred by excluding the entirety of Mrs. Flewellen's police interview as inadmissible hearsay. The Defendant argues that the recording was admissible pursuant to Tennessee Rule of Evidence 106, known as the rule of completeness.

We agree with the State that the Defendant has failed to provide this court with an adequate record for review because the video recording was not included in the appellate record or, indeed, entered as an exhibit or marked for identification at trial.[6] See State v. Goad, 707 S.W.2d 846, 852-53 (Tenn. 1986). We cannot adequately review the trial court's determination without viewing the entire recording. Moreover, because the recording was not marked for identification or made part of the trial record, we are unable to request the trial court clerk to supplement the appellate record.

It is well-settled that when a party seeks appellate review, it has a duty to prepare a record which conveys a fair, accurate, and complete account of what transpired with respect to the issues forming the basis of the appeal. See State v. Ballard, 855 S.W.2d 557, 561 (Tenn. 1993) (holding failure to include transcript precludes appellate review); State v. Bunch, 646 S.W.2d 158, 160 (Tenn. 1983); State v. Oody, 823 S.W.2d 554, 559 (Tenn. Crim. App. 1991) (holding trial court's ruling was presumed correct in the absence of an adequate record on appeal). Where the record is incomplete, an appellate court is precluded from considering the issue. See State v. Roberts, 755 S.W.2d 833, 836 (Tenn. Crim. App. 1988). This issue, therefore, has been waived.

Moreover, plain error relief is not warranted. The doctrine of plain error applies when all five of the following factors have been established:

(a) the record must clearly establish what occurred in the trial court;
(b) a clear and unequivocal rule of law must have been breached;
(c) a substantial right of the accused must have been adversely affected;
(d) the accused must not have waived the issue for tactical reasons; and
(e) consideration of the error must be "necessary to do substantial justice."

State v. Page, 184 S.W.3d 223, 230-31 (Tenn. 2006) (quoting State v. Terry, 118 S.W.3d 355, 360 (Tenn. 2003)) (internal brackets omitted). "An error would have to [be] especially egregious in nature, striking at the very heart of the fairness of the judicial proceeding, to rise to the level of plain error." Id. at 231.

In this case, the record does not clearly establish what occurred in the trial court because the recording is not part of the trial record or the record on appeal. We note, that Mrs. Flewellen was permitted to testify on redirect examination and clarify for the jury that although she assumed the Defendant was driving because the Dodge truck belonged to him, she did not see the driver and did not know with certainty who was driving. In light of the other evidence at trial—including Ms. Davidson's identification, the physical evidence at the scene, and the Defendant's participation in painting the truck—further

---

[6] We note that although the State played a portion of the video recording for the jury at trial, the excerpts similarly were not marked for identification, made an exhibit, or included in the appellate record.

-8-

consideration of the alleged error is not necessary to do substantial justice. The Defendant is not entitled to relief on this basis.

## II.    Sentencing

The Defendant contends that the trial court erred in its application of enhancement and mitigating factors when determining the length of the Defendant's sentence. The Defendant argues that enhancement factor (9), the Defendant possessed or employed a deadly weapon, does not apply to voluntary manslaughter convictions; that the court erroneously applied enhancement factor (10), the Defendant had no hesitation about committing a crime when the risk to human life was high; that the court erred by declining to apply mitigating factor (2), the Defendant acted under strong provocation and improperly considered the Defendant's acquittal of second-degree murder in its determination; that the court made inadequate findings in regard to mitigating factor (3), substantial grounds existed tending to excuse or justify the Defendant's criminal conduct; and that the court did not properly consider mitigating factor (11), the Defendant committed the offense under such unusual circumstances that it was unlikely a sustained intent to violate the law motivated the criminal conduct. See Tenn. Code Ann. §§ 40-35-114(9), (10); -113(2), (3), (11). The Defendant requests de novo review of his sentence by this court. The State responds that the court did not err in its consideration of the enhancement and mitigating factors.

Before a trial court imposes a sentence upon a defendant, it must consider: (a) the evidence adduced at the trial and the sentencing hearing; (b) the presentence report; (c) the principles of sentencing and arguments as to sentencing alternatives; (d) the nature and characteristics of the criminal conduct involved; (e) evidence and information offered by the parties on the enhancement and mitigating factors set forth in Tennessee Code Annotated sections 40-35-113 and 40-35-114; (f) any statistical information provided by the Administrative Office of the Courts ("AOC") as to Tennessee sentencing practices for similar offenses; (g) any statement the defendant wishes to make in the defendant's own behalf about sentencing; and (h) the result of the validated risk and needs assessment conducted by the department and contained in the presentence report. Tenn. Code Ann. § 40-35-210(b). When an accused challenges the length of a sentence, this court reviews the trial court's sentencing determination under an abuse of discretion standard accompanied by a presumption of reasonableness. State v. Bise, 380 S.W.3d 682, 707 (Tenn. 2012). The burden of showing that a sentence is improper is upon the appealing party. See Tenn. Code Ann. § 40-35-401, Sentencing Comm'n Cmts.; see also State v. Arnett, 49 S.W.3d 250, 257 (Tenn. 2001).

This court will uphold the trial court's sentencing decision "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in

compliance with the purposes and principles listed by statute." Bise, 380 S.W.3d at 709-10. Moreover, under such circumstances, appellate courts may not disturb the sentence even if we had preferred a different result. See State v. Carter, 254 S.W.3d 335, 346 (Tenn. 2008). Those purposes and principles include "the imposition of a sentence justly deserved in relation to the seriousness of the offense," Tennessee Code Annotated section 40-35-102(1); a punishment sufficient "to prevent crime and promote respect for the law," Tennessee Code Annotated section 40-35-102(3); and consideration of a defendant's "potential or lack of potential for . . . rehabilitation," Tennessee Code Annotated section 40-35-103(5). See Carter, 254 S.W.3d at 344. Ultimately, in sentencing a defendant, a trial court should impose a sentence that is "no greater than that deserved for the offense committed" and is "the least severe measure necessary to achieve the purposes for which the sentence is imposed." Tenn. Code Ann. § 40-35-103(2) & (4).

The weight to be afforded an enhancement or mitigating factor is left to the trial court's discretion so long as its use complies with the purposes and principles of the 1989 Sentencing Act and the court's findings are adequately supported by the record. Tenn. Code Ann. § 40-35-210(d)-(f); Carter, 254 S.W.3d at 342-43. The trial court is "to be guided by—but not bound by—any applicable enhancement or mitigating factors when adjusting the length of a sentence." Bise, 380 S.W.3d at 706. Further, "a trial court's misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005." Id. Even if the trial court "recognizes and enunciates several applicable mitigating factors, it does not abuse its discretion if it does not reduce the sentence from the maximum on the basis of those factors." Carter, 254 S.W.3d at 345. A sentence imposed by the trial court that is within the appropriate range should be upheld "[s]o long as there are other reasons consistent with the purposes and principles of sentencing, as provided by statute." Bise, 380 S.W.3d at 706.

The trial court sentenced the Defendant for each conviction within the appropriate statutory range and articulated in the record its reasons for imposing the sentences. We note that the sentencing hearing transcript does not reflect that the court applied enhancement factor (10), and the Defendant's argument in this regard has no basis in the record. Moreover, the Defendant has cited to no authority, and we can find none, to support his assertion that enhancement factor (9), the Defendant employed a motor vehicle as a deadly weapon, is not applicable to voluntary manslaughter convictions.[7]

---

[7] The Defendant's reliance on State v. Donald Paul Presley, No. E2000-00592-CCA-R3-CD, 2001 WL 912710, at *7 (Tenn. Crim. App. Aug. 14, 2001), for the proposition that the "mere fact . . . that a deadly weapon was employed . . . is not sufficient, without more, to justify a sentence of total confinement" is misplaced. The sole issue in Presley was the denial of alternative sentencing, not the length of an in-range sentence, and it is inapplicable to the Defendant's issue on appeal.

The Defendant's assertions relative to enhancement factors (9) and (10) are without merit, and he is not entitled to relief on this basis.

Relative to mitigating factor (2), the Defendant's conviction for voluntary manslaughter required a finding that he acted under adequate provocation. See Tenn. Code Ann. § 39-13-211(a). However, the standard for application of mitigating factor (2) is that the Defendant acted under "strong provocation." See Tenn. Code Ann. § 40-35-113(2); State v. Michael R. Blakely, Jr., No. M2001-01114-CCA-R3-CD, 2003 WL 213780, at *14 (Tenn. Crim. App. Jan. 31, 2003). Moreover, we agree with the State that the Defendant's theory at trial was not one of provocation, but rather that the Defendant was not driving and had no reason to harm the victim.

Specifically, the Defendant objects to the court's expressing an opinion that the jury "blessed" the Defendant with a voluntary manslaughter conviction and that the State's evidence could have established a "[k]nowing killing."[8] We interpret the court's statement to mean that although it acknowledged the jury's finding of adequate provocation relative to voluntary manslaughter, the evidence was such that the jury could have reasonably found there to be inadequate provocation and, as an extension, that strong provocation did not exist for purposes of mitigating factor (2).

Relative to mitigating factor (3), the trial court did not articulate findings on the record to explain why it found this factor to be inapplicable. Relative to mitigating factor (11), the Defendant committed the offense under such unusual circumstances that it was unlikely that a sustained intent to violate the law motivated the criminal conduct, the trial court found that it was "totally not being considered by the court. The court [found] that he was motivated, that he did commit this offense, that he did it not intentionally in terms of a first degree murder, but he certainly did fall into . . . what the elements of the offenses require."

We note that the Defendant's having committed the offenses for which he was convicted is not an appropriate factual basis for declining to apply mitigating factor (11). Similarly, the trial court should have made more findings of fact relative to mitigating factor (3). However, any errors were harmless in light of the existing enhancement factors, particularly that the Defendant was on probation at the time the offense was committed and that the Defendant had a history of criminal behavior in addition to the felonies used to establish his sentencing range. Moreover, the court gave the enhancing factors "great weight."

We again repeat that a trial court's erroneous consideration of some enhancement or mitigating factors, which are merely advisory, does not give this court grounds for

---

[8] The Defendant has not cited to any authority in this regard.

reversal when the trial court otherwise conforms with the mandates of the Sentencing Act. See Bise, 380 S.W.3d at 709-10; Carter, 254 S.W.3d at 346. The record demonstrates that the trial court otherwise sentenced the Defendant in accordance with our Sentencing Act. Accordingly, we cannot say that the Defendant has established that the trial court abused its discretion in setting the length of his sentences at an effective ten years. See, e.g., State v. Andrew Young Kim, No. W2017-00186-CCA-R3-CD, 2018 WL 1679346, at *11 (Tenn. Crim. App. Apr.6, 2018); State v. Joshua Iceman, No. M2016-00975-CCA-R3-CD, 2017 WL 4805118, at *32 (Tenn. Crim. App. Oct. 24, 2017), perm. app. denied (Tenn. Feb. 14, 2018); State v. Richard Dickerson, No. W2012-02283-CCA-R3-CD, 2014 WL 1102003, at *12 (Tenn. Crim. App. Mar. 19, 2014) (all three cases concluding that the trial court improperly considered two of three enhancement factors it applied but, nonetheless, otherwise conformed with the mandates of the Sentencing Act, so the defendant was not entitled to relief). The trial court did not abuse its discretion in sentencing the Defendant to the maximum term available, and the Defendant is not entitled to relief on this basis.

## CONCLUSION

Upon consideration of the foregoing and the record as a whole, the judgments of the trial court are affirmed.

_____
D. KELLY THOMAS, JR., JUDGE